WILLIAM LINN, plaintiff in error *v.* THE PRESIDENT AND DIRECTORS OF THE STATE BANK OF ILLINOIS, defendants in error.

*Error to Jackson.*

The Supreme Court of the United States is the proper and constitutional forum to decide, and finally to determine all suits where is drawn in question " the validity of a statute of, or an authority exercised under any State, on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, and the decision is in favor of such validity."

Where the Supreme Court of the United States has decided that a State law violates the Constitution of the United States, the judges of the respective States have no right to overrule or impugn such decision.

The bills issued by the old State Bank of Illinois, were "bills of credit". within the meaning of the Constitution of the United States: and a note given in consideration of such bills, is void, and cannot be collected by law.

The case of Snyder *v.* the State Bank of Illinois, Breese 122, is overruled.

THIS was an action of debt instituted by the defendants in error in the Jackson Circuit Court, against the plaintiff in error, upon a sealed note.

The declaration is in the usual form.

The defendant in the Court below, the plaintiff in error, filed the following pleas:

"And the said defendant comes and defends the wrong and injury, when, &c. and craves *oyer* of the said supposed writing obligatory in the said plaintiffs' declaration mentioned, and it is read to him in these words : " Twelve months after date I promise to pay to the President and Directors of the State Bank of Illinois, at their Branch Bank at Brownsville, for the use of the People of said State, four hundred and fifty dollars for value received. Witness my hand and seal this 13th July, 1822.

" Witness Jo. Duncan. WILLIAM LINN. [L.S.] "

which being read and heard, the said defendant says that the said plaintiffs ought not to have or maintain their said action against him, this defendant, because he says that the said writing

obligatory was sealed and delivered by him to the said plaintiffs for the notes or bills issued and emitted by the said President and Directors of the said State Bank of Illinois, under and by virtue of an act of the General Assembly of the said State, entitled "*An Act establishing the State Bank of Illinois,*" passed in the year of our Lord 1821, which said act of the General Assembly is here inserted, and made a part of this plea.

By which said act the said notes or bills of said Bank are not redeemable or payable by said Bank until after the expiration of ten years from and after the passage of the said act incorporating said Bank, and from and after the time said notes or bills should be emitted and issued by said Bank, which said notes or bills were issued or emitted on the          day of July, 1821, and the emission and delivery thereof by the said plaintiffs to this defendant were the sole and only consideration for the said writing obligatory so executed as aforesaid, and for no other consideration whatever was the said writing obligatory executed, sealed, and delivered by the defendant to the said plaintiffs; which said notes or bills so emitted, issued, and delivered as aforesaid, by the said plaintiffs to this defendant, are bills of credit within the true intent and meaning of the Constitution of the United States; and so the said defendant says, that the said writing obligatory in the said plaintiffs' declaration mentioned, was sealed and delivered by this defendant to the said plaintiffs, without his having received of and from said plaintiffs, any good or valuable consideration therefor, and this he is ready to verify, wherefore he prays judgment if the said plaintiffs ought to have or maintain their said action thereof against him this defendant, &c.

S. Breese, for defendant.

And for further plea in this behalf "the said defendant says that the plaintiffs aforesaid ought not to have or maintain their aforesaid action against him, because he says that heretofore, to wit, at the term of the Circuit Court for Jackson county, State of Illinois, in the year of our Lord          , the said plaintiffs impleaded the said defendant in a certain plea or action of *scire facias* on a mortgage executed by this defendant to said plaintiffs, for securing the payment of the same identical sum of money in the said declaration mentioned; and such proceedings were thereupon had in said Court in that action, that afterwards, to wit, at the May term, 1825, of said Court, the said plaintiffs by the consideration and judgment of said Court, recovered against said defendant the sum of $167,75, and costs, it being the amount due upon said mortgage, which was given to secure the payment of the note on which this suit is brought, whereof the said defendant is convicted, as by the records and proceedings remaining in said Court will more fully and at large appear; which said judgment still remains in full force and effect,

Linn v. State Bank of Illinois.

not the least reversed or made void, all which 'the said defendant is ready to verify by the record, wherefore he prays judgment if the said plaintiffs ought to have or maintain their said action against him this defendant.

S. Breese, for defendant.

To each of these pleas a demurrer was filed, which was sustained by the Court, and a judgment rendered for the plaintiffs in the Court below, for $351,95 and costs.

The cause was tried at the October term, 1831, before the Hon. Thomas C. Browne.

S. Breese and D. J. Baker, for the plaintiffs in error.

J. Semple, Attorney General, for the defendant in error, contended,

1st. This Court has no jurisdiction to declare a law of the State legislature unconstitutional and void, and to disregard it.

2d. If this Court has such a power, the law is valid and not repugnant to the Constitution either of the United States or of the State of Illinois.

3d. Admitting the law to be void or repugnant to the Constitution, yet the contract founded on the law is obligatory on the parties.

Lockwood, Justice, delivered the opinion of the Court:

This is an action of *debt*, brought on a sealed note, executed by Wm. Linn to the plaintiffs below. The defendant in the Court below, pleaded that the writing obligatory was sealed and delivered by him to the plaintiffs, for and in consideration of bills issued and emitted by the plaintiffs, under and by virtue of an act of the legislature of the State of Illinois, entitled "*An Act establishing the State Bank of Illinois*," and that the emitting and issuing said bills by said Bank, under and by authority of said act, was a violation of the 10th Section of the 1st Article of the Constitution of the United States, which forbids a State to "emit bills of credit."

To these pleas the plaintiffs below demurred, and judgment was given in the Circuit Court in favor of the Bank. To reverse this judgment, the defendant below has brought a writ of error to this Court.

The main question presented by this case for the consideration of this Court, is whether the act establishing the State Bank, so far as said act authorized the issuing of the bank bills which formed the consideration of the sealed note sued on, is a violation of the Constitution of the United States.

To support the position that the issuing the bank bills mentioned in the plea, is a violation of the Constitution of the United States, the counsel for the plaintiff in error cited the case decided

H*

in the Supreme Court of the United States, of Craig, *et al. v.*
The State of Missouri.(1)

This Court recognises the correctness of the doctrine that the
Supreme Court of the United States is the proper and constitu-
tional forum to decide and finally to determine all suits where
is drawn in question " the validity of a statute of, or an authority
exercised under, any State, on the ground of its being repugnant
to the Constitution, treaties, or laws of the United States, and
the decision is in favor of such validity."

The decision of the demurrer in the Court below necessarily
drew in question the validity of the statute establishing the State
Bank of Illinois; and that decision being in favor of its validity,
brings this cause within the doctrine above acknowledged. And
although the question involved in this case is of immense impor-
tance to the people of this State, and affects interests of great
magnitude, yet the duty that devolves on this Court is a very
plain one. It is simply to ascertain what the Supreme Court of
the United States has decided in an analogous case, and then de-
cide in accordance with the decision of that Court. When the
Supreme Court of the United States have decided that a State law
violates the Constitution of the United States, the judges of the
respective States have no right to overrule or impugn such deci-
sion. State judges are sworn to support the Constitution of the
United States, and that instrument in its 6th Article declares,
that "This Constitution, and the laws of the United States which
shall be made in pursuance thereof, and all treaties made, or which
shall be made, under the authority of the United States, shall be
the Supreme Law of the land, and the judges in every State shall .
be bound thereby; anything in the constitution or laws of any
State to the contrary notwithstanding."

As then this Court is bound to conform its decisions on ques-
tions relative to the unconstitutionality of State laws, to the de-
cisions of the Supreme Judicial Tribunal of the nation, it becomes
necessary to ascertain what that Court has decided in the case of
Craig, *et al. v.* The State of Missouri. Chief Justice Marshall,
who delivered the opinion of the majority of the Court, investi-
gates the questions " What is a bill of credit?" and " What did
the Constitution mean to forbid ?" in his usual lucid and forcible
manner. He says that a bill of credit " in its enlarged and per-
haps literal sense, may comprehend any instrument by which a
State engages to pay money at a future day; thus including a
certificate given for money borrowed. But the language of the
Constitution itself, and the mischief to be prevented, which we
know from the history of our country, equally limit the inter-
pretation of the terms. The word ' emit' is never employed in
describing those contracts by which a State binds itself to pay

(1) 4 Peters 410..

money at a future day for services actually received, or for money borrowed for present use; nor are instruments executed for such purposes, in common language denominated ' bills of credit.' To ' emit bills of credit,' conveys to the mind the idea of issuing paper intended to circulate through the community for its ordinary purposes, as money, which paper is redeemable at a future day. This is the sense in which the terms have been always understood. At a very early period of our colonial history, the attempt to supply the want of the precious metals by a paper medium, was made to a considerable extent; and the bills emitted for this purpose have been frequently denominated bills of credit. During the war of our revolution we were driven to this expedient; and necessity compelled us to use it to a most fearful extent. The term has acquired an appropriate meaning; and ' bills of credit ' signify a paper medium intended to circulate between individuals, and between government and individuals, for the ordinary purposes of society. Such a medium has been always liable to considerable fluctuation. Its value is continually changing; and these changes, often great and sudden, expose individuals to immense loss, are the sources of ruinous speculations, and destroy all confidence between man and man. To cut up this mischief by the roots, a mischief which was felt throughout the United States, and which deeply affected the interest and prosperity of all, the people declared in their Constitution that ' No State shall emit bills of credit.' If the prohibition means anything, if the words are not empty sounds, it must comprehend the emission of any paper medium by a State government, for the purpose of common circulation.

" What is the character of the certificates issued by authority of the act under consideration ? What office are they to perform ? Certificates signed by the Auditor and Treasurer of the State, are to be issued by those officers to the amount of $200,000, of denominations not exceeding $10, nor less than 50 cents. The paper purports on its face to be receivable at the Treasury or at any loan office of the State of Missouri, in discharge of taxes or debts due to the State.

" The law makes them receivable in discharge of all taxes or debts due to the State, or any county or town therein, and of all salaries and fees of office, to all officers, civil and military, within the State; and for salt sold by the lessees of the public salt works. It also pledges the faith and funds of the State for their redemption. It seems impossible to doubt the intention of the legislature in passing this act, or to mistake the character of these certificates, or the office they were to perform. The denomination of the bills, from $10 to 50 cents, fitted them for the purpose of ordinary circulation; and their reception in payment of taxes and debts to the government and to corporations, and of

salaries and fees, would give them currency. They were to be put into circulation; that is, emitted by the government. In addition to all these evidences of an intention to make these certificates the ordinary circulating medium of the country, the law speaks of them in this character; and directs the Auditor and Treasurer to withdraw annually one-tenth of them from circulation. Had they been termed ‘bills of credit,’ instead of certificates, nothing would have been wanting to bring them within the prohibitory words of the Constitution.

“And can this make any real difference? Is the proposition to be maintained, that the Constitution meant to prohibit names and not things? That a very important act, big with great and ruinous mischief, which is expressly forbidden by words most appropriate for its description, may be performed by the substitution of a name? That the Constitution, in one of its most important provisions, may be openly evaded by giving a new name to an old thing? We cannot think so. We think the certificates emitted under the authority of this act, are as entirely ‘bills of credit,’ as if they had been so denominated in the act itself.

“But it is contended, that though these certificates should be deemed ‘bills of credit,’ according to the common acceptation of the term, they are not so in the sense of the Constitution, because they are not made a legal tender.”

“The Constitution itself furnishes no countenance to this distinction. The prohibition is general. It extends to all ‘bills of credit,’ not to bills of a particular description. That tribunal must be bold indeed, which, without the aid of other explanatory words, could venture on this construction. It is the less admissible in this case, because the same clause of the Constitution contains a substantive prohibition to the enactment of tender laws. The Constitution therefore considers the emission of ‘bills of credit,’ and the enactment of tender laws, as distinct operations, independent of each other, which may separately be performed. Both are forbidden. To sustain the one because it is not also the other; to say that ‘bills of credit’ may be emitted, if they be not made a tender in payment of debts, is, in effect, to expunge that distinct independent prohibition, and to read the clause, as if it had been entirely omitted. We are not at liberty to do this.”

“The history of paper money has been referred to for the purpose of showing that its great mischief consists in being made a tender; and that therefore the general words of the Constitution may be restrained to a particular intent.” “Was it even true, that the evils of paper money resulted solely from the quality of its being made a tender, this Court would not feel itself authorized to disregard the plain meaning of words, in search of

a conjectural intent to which we are not conducted by the lan-. guage of any part of the instrument. But we do think that the history of our country proves either that being made a tender in payment of debts is an essential quality of " bills of credit,' or the only mischief resulting from them. It may, indeed, be the most pernicious; but that will not authorize a Court to convert a general into a particular prohibition."

The Chief Justice, after giving several examples taken from the history of the United States, and several of its members, of issues of paper money, some of which were made a tender in payment of debts, and others not, and showing the evils that resulted to the country from their emission, and that the evils with which their emission was fraught, did not depend upon their being made a legal tender,—and contending that all these issues of paper money were alike " bills of credit," comes to the conclusion, that the certificates issued by the loan office in Missouri, were " bills of credit," in the sense of the Constitution, and consequently their emission was forbidden by that instrument. The Chief Justice then enquires, " Is the note executed by Craig, valid, the consideration of which consisted in lending to him of these loan-office certificates? He says, " It has been long settled, that a promise made in consideration of an act forbidden by law, is void. It will not be questioned, that an act forbidden by the Constitution of the United States, which is the supreme law, is against law. Now, the Constitution of the United States forbids a State to ' emit bills of credit.' The loan of these certificates is the very act which is forbidden. It is not the making of them while they lie in the loan-offices; but the issuing of them, the putting them into circulation, which is the act of emission; the act that is forbidden in the Constitution. The consideration of this note is the emission of bills of credit by the State.

" The very act which constitutes the consideration, is the act of emitting bills of credit, in the mode prescribed by the law of Missouri; which act is prohibited by the Constitution of the United States." The Chief Justice after citing a number of decisions to show that bonds and notes given on illegal considerations, are void, says that " a majority of the Court feel constrained to say, that the consideration on which the note in this case (the case of Craig *v.* The State of Missouri) was given, is against the highest law of the land, and that the note itself is utterly void."

Having thus ascertained what the Supreme Court of the United States has decided in the case referred to, the question here arises: Is there such a difference between the certificates issued by the loan-office in Missouri, and the bills issued by the Bank established in this State, as to exempt these bills from being con-

sidered " bills of credit " within the meaning of the Constitution of the United States ?

A concise review of a few of the provisions of the "*Act establishing the State Bank of Illinois*" will show a very close and striking resemblance. The Bank was to be owned by the State. The cashiers were to give bond with security for the use of the State, for the faithful discharge of the duties of their office. The Bank was to issue notes or bills to the amount of $300,000, in bills not exceeding $20, nor less than $1, and their form is prescribed. They were to bear two per cent. interest, and to contain a promise to pay.

The bills thus to be issued were to be receivable at all times for debts due the State, or to any county, or to the Bank. The $200,000 of bills as soon as they could be prepared for "Missouri," were to be loaned to citizens of the State, and the loans were to be made in the different counties according to population. All the revenues, lands, town lots, funds, and other property of the State were " pledged " for the redemption of the bills, and the legislature " pledged " themselves at the expiration of ten years from the passage of the act, to redeem all the bills to be issued by virtue of the act, in gold and silver. The Bank was also required to withdraw from circulation, annually, one-tenth part of the whole amount of the bills issued.

From this statement of the prominent features of the bank law, it clearly appears that our Bank and the Missouri loan-office, although called by different names, were similar in their objects, and both were established for the purpose of emitting a paper currency to circulate as money in the respective States. The issuing of these bills, is, according to the decision of the Supreme Court of the United States, emitting " bills of credit," and a violation of the Constitution of the United States. It is also to be remarked in relation to the act establishing our State Bank, that it is obnoxious to the charge of attempting to force the bills of the Bank into circulation by staying creditors from collecting their debts for three years, unless they would receive these bills in payment.

It results from this review of the provisions of the bank law, that it contains objectionable features not found in the Missouri loan-office law; and there can be no doubt if this case were presented to the Supreme Court of the United States, that that Court would decide that the bills issued by the State Bank of Illinois, were " bills of credit," and that the sealed note on which this action was brought, was given for an illegal consideration, and therefore null and void.

Such being the opinion of this Court, we are compelled to say that the judgment of the Circuit Court must be reversed.

As the decision now given conflicts with the decision of this

Court in the case of Snyder *v.* The President and Directors of the State Bank of Illinois,(1) it is proper to notice the circumstances under which that decision was made. This Court there say, " That the debtors of the Bank cannot raise the objection that the charter of the Bank is a violation of the Constitution. After having borrowed the paper of the institution, both public policy and common honesty require that the borrowers should repay it." It is therefore unnecessary to decide whether the incorporation of the Bank was a violation of the Constitution or not. This decision was made in 1826, and before the decision in the Supreme Court of the United States, and under circumstances that did not afford this Court an opportunity to investigate authorities to any extent. Similar decisions had been made in Missouri and Kentucky, and it was understood, in other States. The error, therefore, which this Court fell into in that case, was as far as the information of the Court extended, a common one. A further apology might be offered for the error, in the consideration that after all the light that time and fuller investigation had shed upon the subject, one, at least, if not more of the Judges of the Supreme Court of the United States entertain the same opinion.

*Judgment reversed.*

*Note.* The case of Craig *et al. v.* The State of Missouri, was decided in 1830, by a bare majority of the Court. The Supreme Court of the United States then consisted of John Marshall, William Johnson, Gabriel Duvall, Joseph Story, Smith Thompson, John McLean, and Henry Baldwin.

Justices Thompson, Johnson, and McLean did not assent to the opinion of the Court in that case. 4 Peters 425.

In 1837, the case of Briscoe *et al. v.* The Bank of the Commonwealth of Kentucky, came before the Supreme Court of the United States. The following points were decided in that case, by the Court consisting of Roger B. Taney, Joseph Story, Smith Thompson, John McLean, Henry Baldwin, James M. Wayne, and Philip P. Barbour. Justice Story alone dissented from the opinion of the Court.

" On the 29th of November, 1820, the legislature of Kentucky passed an act, establishing a bank, by the name of ' The Bank of the Commonwealth of Kentucky." The first section of the act, declares that the bank shall be established " in the name and behalf of the Commonwealth of Kentucky;" under the direction of a president and twelve directors, to be chosen by the legislature. The second section enacts, that the president and directors shall be a corporation, capable of suing, and being sued, and of purchasing, and selling every description of property. The third section declares the bank to be, exclusively, the property of the commonwealth. The fourth section authorizes the issuing of notes: and the fifth declares the capital to be two millions of dollars: to be paid by all moneys afterwards paid into the treasury for the vacant lands of the State, and so much of the capital stock as was owned by the State in the Bank of Kentucky; and as the treasurer of the State received those moneys, he was required to pay them into the bank. The bank had authority to receive money on deposite, to make loans on good personal security, or on mortgage; and was prohibited increasing its debts beyond its. capital. Limitations were imposed on loans, and the accommodations of the bank were apportioned among the different counties of the State. The bank was, by a subsequent act, authorized to issue

(1) Breese 122.

three millions of dollars; and the dividends of the bank were to be paid to the treasurer of the State. The notes of the bank were issued in the common form of bank notes; in which the bank promised to pay to the bearer on demand, the sum stated on the face of the note. The pleadings excluded the Court from considering that any part of the capital had been paid by the State; but in the argument of the case, it was stated, and not denied, that all the notes which had been issued, and payment of which had been demanded, had been redeemed by the bank. By an act of the legislature of Kentucky, it was required that the notes of the bank should be received on all executions by plaintiffs, and if they failed to endorse on such execution, that they would be so received, further proceedings on the judgment were delayed for two years. The Bank of the Commonwealth of Kentucky instituted a suit against the plaintiffs in error, on a promissory note for which the notes of the bank had been given, as a loan, to the drawers of the note. The defendants in the suit claimed that the note given by them was void, as the same was given for the notes of the bank, which were "bills of credit" issued by the State of Kentucky; against the provisions of the Constitution of the United States, which prohibits the issuing of "bills of credit" by the States of the United States: and that the act of the legislature of Kentucky, which established the bank, was unconstitutional and void. By the Court.—The act incorporating the Bank of the Commonwealth of Kentucky, was a constitutional exercise of power, by the State of Kentucky; and the notes issued by the bank are not bills of credit, within the meaning of the Constitution of the United States.

The definition of the terms "bills of credit," as used in the Constitution of the United States, if not impracticable, will be found a work of no small difficulty.

The terms bills of credit, in their mercantile sense, comprehend a great variety of evidences of debt, which circulate in a commercial country. In the early history of banks, it seems their notes were generally denominated "bills of credit;" but in modern times they have lost that designation, and are now called either bank bills, or bank notes. But the inhibitions of the Constitution apply to "bills of credit," in a limited sense.

The definition of a bill of credit, which includes all classes of bills of credit emitted by the colonies and States, is a paper issued by the sovereign power, containing a pledge of its faith, and designed to circulate as money.

If the legislature of a State attempt to make the notes of any bank a tender, the act will be unconstitutional; but such attempt could not affect, in any degree, the constitutionality of the bank. The act which related to the receiving the notes of the Bank of the Commonwealth of Kentucky, was not connected with the charter.

The federal government is one of delegated powers: all powers not delegated to it, or inhibited to the States, are reserved to the States or to the people.

A State cannot emit bills of credit, or in other words, it cannot issue that description of paper to answer the purposes of money, which was denominated before the adoption of the Constitution, bills of credit. But a State may grant acts of incorporation for the attainment of these objects, which are essential to the interests of society. This power is incident to sovereignty; and there is no limitation on its exercise by the States, in respect to the incorporation of banks, in the federal Constitution.

At the time of the adoption of the Constitution, the "Bank of North America," and "the Massachusetts Bank," and some others, were in operation. It cannot therefore be supposed that the notes of these banks were intended to be inhibited by the Constitution, or that they were considered as "bills of credit," within the meaning of that instrument. In many of their most distinguishing characteristics, they were essentially different from bills of credit, in any one of the various forms in which they were issued. If then the powers not delegated to the federal government, nor denied to the States, are retained by the States or the people; and by a fair construction of the terms "bills of credit," as used in the Constitution, they do not include ordinary bank notes; it follows, that the power to incorporate banks to issue these notes, may be exercised by a State.

A uniform course of action, involving the right to the exercise of an important power by the State government for half a century, and this almost without question; is no unsatisfactory evidence that the power is rightfully exercised.

A State cannot do that, which the federal Constitution declares it shall not do. It cannot "coin money." Here is an act inhibited in terms so precise, that they

cannot be mistaken. They are susceptible but of one construction. And it is certain that a State cannot incorporate any number of individuals, and authorize them to coin money. Such an act would be as much a violation of the Constitution, as if money were coined by an officer of the State under its authority. The act being prohibited, cannot be done by a State directly or indirectly. The same rule applies to bills of credit issued by a State.

To constitute a "bill of credit" within the Constitution, it must be issued by a State, on the faith of the State, and designed to circulate as money. It must be a paper which circulates on the credit of the State; and so received and used in the ordinary business of life. The individual or committee who issue it, must have power to bind the State; they must act as agents, and of course not incur any personal responsibility, nor impart, as individuals, any credit to the paper. These are the leading characteristics of a bill of credit, which a State cannot emit. The notes issued by the Bank of the Commonwealth of Kentucky have not these characteristics.

When a State emits bills of credit, the amount to be issued is fixed by law; as also the fund out of which they are to be paid, if any fund be pledged for their redemption: and they are issued on the credit of the State, which in some form appears upon the face of the notes, or by the signature of the person who issues them.

No sovereign State is liable to be sued without her consent. Under the articles of confederation, a State could be sued only in cases of boundary. It is believed that there is no case where a suit has been brought, at any time, on a bill of credit against a State; and it is certain that no suit could have been maintained on this ground, prior to the Constitution.

The case of Craig *v.* The State of Missouri, 4 Peters 410, is not authority to sustain the claim that the notes of the Bank of the Commonwealth were bills of credit. The decisions in that case applied to obligations of an entirely different character.

There is no principle decided by this Court, in the case of Craig *v.* The State of Missouri, which at all conflicts with the views presented by the Court in this case. Indeed the views of the Court are sustained and strengthened, by contrasting the present case with that.—11 Peters 257.